Mary Lou **RINDAHL**, Respondent,

v.

**NATIONAL FARMERS UNION INSURANCE COMPANIES,**
Petitioner, Appellant.

No. C4–84–267.

Supreme Court of Minnesota.

Aug. 23, 1985.

Robert J. Schmitz, Crookston, for appellant.

Robert M. Albrecht, Hallock, for respondent.

SIMONETT, Justice.

This case involves no-fault benefits eligibility for a farm wife who at the time of her injury worked in the home, helped with the farmwork, and held a full-time job in town. We affirm the trial court and the court of appeals on the award for replacement service loss benefits but reverse the award for income loss benefits for part-time farmwork.

Plaintiff-respondent Mary Lou Rindahl resides on a farm in Kittson County with her husband and five children. On July 14, 1978, she was in an auto accident and sustained a serious, disabling injury to her right foot. She brings this action for no-fault benefits against her insurance carrier, defendant-appellant National Farmers Union Insurance Companies, for both income loss and household services loss. The

court of appeals, affirming the trial court, held that she was entitled to both kinds of benefits. *Rindahl v. National Farmers Union Insurance Cos.*, 352 N.W.2d 837 (Minn.App.1984). We granted the insurer's petition for further review.

At the time of her injury, Mrs. Rindahl was employed full time, 40 hours a week, as an "outreach" worker for the Inter-County Community Council of Oklee. She also put in 28 hours a week caring for the household and about 7 hours a week helping with farmwork. For more than a year following the accident, Mrs. Rindahl was unable to return, on any regular basis, to her job at the Community Council. The insurer acknowledges it owes income loss benefits for Mrs. Rindahl's wage loss from her job in town, but it denies liability for no-fault benefits for either loss of household services or inability to do farmwork.

The parties have stipulated that claimant's injury prevents her from performing the farmwork that she was able to perform before the accident. They have further stipulated that Mrs. Rindahl's disability rendered her unable to perform any household services for 44 weeks; that for 67 weeks she was able to perform 75% of those services; and that at all other pertinent times she has been able to perform only 50% of her household services. The Rindahls have never hired anyone to perform the lost household services; instead, other members of the family have taken up the slack. Neither have the Rindahls hired any farm help. The Rindahls also claim they had to abandon a hog operation because of Mrs. Rindahl's disability, resulting in lost farm profits.

## I.

The first issue is whether Mrs. Rindahl is entitled to replacement service loss benefits. The first clause of Minn.Stat. § 65B.44, subd. 5 (1982), provides:

> Replacement service loss benefits shall reimburse all expenses reasonably incurred by or on behalf of the nonfatally injured person in obtaining usual and necessary substitute services in lieu of

those that, had he not been injured, the injured person would have performed not for income but for the direct benefit of himself or his household; * * *.

Clearly, Mrs. Rindahl is not entitled to benefits under the foregoing clause because she did not hire substitute help. We held in *Nadeau v. Austin Mutual Ins. Co.*, 350 N.W.2d 368 (Minn.1984), that this clause provides benefits only for actual expenses incurred in hiring substitute household help. But the statute continues with a second clause, not involved in *Nadeau,* which reads:

> [I]f the nonfatally injured person *normally, as a full time responsibility,* provides care and maintenance of a home with or without children, the benefit to be provided under this subdivision shall be the reasonable value of such care and maintenance or the reasonable expenses incurred in obtaining usual and necessary substitute care and maintenance of the home, whichever is greater. [Emphasis added.]

■ In other words, under this second clause, if the injured person "normally, as a full time responsibility," takes care of the home, that person is not required to incur actual expense for replacement help but can recover the reasonable value of her or his own household services. Apparently this clause is unique. It does not appear in the Uniform Act nor have we found a similar provision in the no-fault statutes of other states. *See* Uniform Motor Vehicle Accident Reparations Act § 1(a)(5)(iii) and Commissioner's Comment, subsection (a)(5), 14 U.L.A. 50, 55 (1980); and 4 R.H. Long, *The Law of Liability Insurance, Evaluation of No-Fault Proposals* ch. 28 (1984).

■ The precise issue, then, is what did the legislature mean by "full time responsibility"? National Farmers Union argues that someone who holds a full-time job outside the home is not devoting full time to the home. The insurer argues that full-time responsibility must mean either a homemaker who is not employed outside the home or a homemaker who has exclu-

sive responsibility for all household services. We agree with the trial court and the court of appeals that these definitions are too restrictive and neither comports with legislative intent. In any family there is some sharing of household responsibilities and, in an emergency, some readjustment of these duties among the family members. Ordinarily, however, there is one family member who is in charge and who does most of the work in the home. It is injury to this person which most definitely results in an economic loss to the family unit. It is this person, we think, that the legislature had in mind in referring to the person with "full time responsibility." The legislative emphasis is not on how much of this person's total available work time is spent on household management. The emphasis, rather, is more on the nature and extent of the responsibilities performed and how much of the aggregate family time devoted to household care is contributed by the injured person in comparison to other members of the family. We conclude that "full time responsibility," as used in section 65B.44, subd. 5, means primary responsibility for management of the household.

■ The trial judge found that Mrs. Rindahl was "primarily responsible for all housework [and] child care." The finding is supported by the evidence. Prior to her accident, Mrs. Rindahl would get up each workday, make breakfast for the family, get the children ready for school, and do the dishes. When she returned at night, she made supper, did the dishes for the day, and attended to the children's needs and other household chores. She did all the cooking and baking except for the noon sandwiches, which her husband prepared for himself and two of the five children on her workdays during the winter months. She did the housecleaning, vacuuming, windows, and washed the family clothes. She did most of the lawn and garden work, plus grocery shopping, planning of meals, and organizing the children for their various activities. The household was clearly her domain. Mr. Rindahl did take care of the two youngest children (ages 3 and 4 at the time of the accident) during the day in the winter months while the mother was at work. The husband also did "some general clean up [and] fixing * * * around the house," and the older children helped with household chores. The contributions of the children and husband to the household services were, however, of a secondary nature. Their contributions were not unlike those of family members in a home where the mother does not have outside employment.

The trial court found that the reasonable value of Mrs. Rindahl's household services was $4 an hour and awarded her replacement service loss benefits of $15,848. We affirm this award.

## II.

The next issue is whether Mrs. Rindahl is entitled to disability and income loss benefits for inability to do farmwork.

The parties agree that Mrs. Rindahl's disability prevents her from doing farmwork. Before the accident, she averaged 7 hours a week on farm chores. The trial court held she was entitled to the reasonable value of these lost services at $5 an hour, and awarded income loss benefits of $9,765.

Minn.Stat. § 65B.44, subd. 3 (1982), provides that "[d]isability and income loss benefits shall provide compensation for 85 percent of the injured person's loss of present and future gross income from *inability to work* proximately caused by the nonfatal injury subject to a maximum of $200 per week." (Emphasis added.) Two questions arise: (1) Does Mrs. Rindahl meet the "inability to work" requirement? and (2), if so, how is her economic loss as a self-employed farmworker to be determined?

Subdivision 3 defines "inability to work" to mean:

[D]isability which prevents the injured person from engaging *in any substantial gainful occupation or employment on a regular basis,* for wage or profit, for which he is or may by training become reasonably qualified. If the injured person returns to his employment

and is unable by reason of his injury to work continuously, compensation for lost income shall be reduced by the income received while he is actually able to work. [Emphasis added.]

The insurer argues that Mrs. Rindahl's disability has not prevented her from returning to full-time work on a regular basis with the Community Council and, therefore, she has not shown "inability to work." Mrs. Rindahl, on the other hand, says she cannot do any of the farmwork that she did before. In other words, claimant and the insurer each attempt to focus on only one part of claimant's pre-injury employment. The injured person's employment is not, however, to be so compartmentalized. Subdivision 3 above refers to "any" occupation or employment. The question, then, is whether Mrs. Rindahl, having returned to most but not all of her pre-injury employment, can be said to be prevented by her disability from engaging in substantial, gainful employment. We think this phrase requires a comparison of the claimant's pre-injury employment with her post-injury employment.

Here claimant returned full time to her employment at the Community Council but she did not return to any farmwork. Was Mrs. Rindahl's prior farmwork "gainful" employment in the sense that it generated "income" as that term is defined in the No-Fault Act? In other words, we must determine if she was earning any income from farmwork before her injury. If she was not, then her farmwork is irrelevant, and it is clear that Mrs. Rindahl, having returned full time to her work in town, which was her only pre-injury income-generating work, has not been prevented by her disability from engaging in any substantial, gainful employment.[1]

With respect to her farm chores, Mrs. Rindahl, a co-owner of the farm, is a self-employed person. Minn.Stat. § 65B.44, subd. 3 (1982), as already noted, provides

for income loss benefits based on 85% of the injured person's "gross income." The subdivision then adds that "[l]oss of income *includes* the costs incurred by a self-employed person to hire substitute employees." (Emphasis added.) The insurer argues this added sentence means that a self-employed person who does not receive a wage or salary may, alternatively, collect for substitute help, but this is the exclusive alternative. Claimant puts a different stress on the word "includes" and argues that the cost of substitute help is mentioned in the statute only as *illustrative of* one of several ways that a self-employed person might prove income loss. On the other hand, Professor Steenson has commented: "The self-employed individual is covered to the extent that the cost of hiring a substitute employee to perpetuate income is classified as loss. If it is not possible to hire a substitute and if there is a decline in profits for the period during which the claimant is injured, the profits should also be covered." M. Steenson, *Minnesota No-Fault Automobile Insurance* 51 (1982).

▪ To bolster her argument that income loss should not be limited to wages or cost of substitute help, Mrs. Rindahl points to the statutory definition of "income." Subdivision 6 of section 65B.43 defines income as:

[S]alary, wages, tips, commissions, professional fees and other earnings from work or tangible things of economic value produced through work in individually owned businesses, farms, ranches or other work.

Claimant says that her farmwork constitutes a tangible thing of economic value. The insurer counters that, even if so, any "tangible things of economic value" which Mary Lou Rindahl could not provide because of her injury have been provided to the Rindahl family at no cost by the volunteer services of other family members,

---

1. Of course, there was a period of about a year following the auto accident that Mrs. Rindahl was unable to work at the Community Council, and for this period of time, clearly she had an "inability to work." For this period of time, the question would be whether Mrs. Rindahl's income loss benefit claim, which admittedly includes her wage loss at the Community Council, should also include her alleged loss of income for inability to do farmwork.

and so, as in *Nadeau*, there has been no showing of any genuine economic loss by claimant.

How the legislature intended the No-Fault Act to compensate for income loss of a self-employed person is not as clear as it might be. We perceive a legislative concern that benefits be calculated on some direct, certain basis which will discourage abuse and will enable benefits to be paid promptly and with a minimum of fuss. We also think it is clear that the legislature did not intend to penalize a self-employed person by denying her or him benefits if that person did not elect to take a salary or wage from the business. Further, we are persuaded that the legislature did not intend income loss, in the absence of a salary or wage, to be limited to costs incurred in hiring substitute help. Having said this, it would appear that the self-employed person who takes no salary or wage from the business may recover income loss benefits by proving either (1) costs incurred for substitute employees, or (2) loss of tangible things of economic value, or (3) loss of "other earnings from work." Which method applies depends on which is appropriate to the claimant's situation.

■■■ As already noted, Mrs. Rindahl argues that her farmwork is a tangible thing of economic value, and, therefore, she should recover income loss benefits for the reasonable value of her services to the farm operation. We disagree. Mrs. Rindahl seeks to recover for her work, not for things produced by her work. The two are not the same. Her work, for which she wants to be paid its reasonable value, is an activity which causes something to be produced, but it is not the thing produced. Moreover, the statute defines income as "tangible things of economic value produced through work." By equating her work with the tangible things produced thereby, Mrs. Rindahl reduces the statutory definition of income to the tautology of "work produced through work." If the legislature had intended "income" to include the reasonable value of one's services to one's business, we believe it would have said so. It did say so, as we have seen, in the case of replacement household services but, even there, carefully restricted the claim to the person with full-time responsibility for the home. We hold, therefore, that income loss benefits cannot be based on the reasonable value of the injured self-employed person's services, and that the trial court erred in making such an award.

■■■ If self-employed persons are not entitled to the reasonable value of their services, claimant then argues that they should be entitled to income loss benefits measured by lost profits. Our No-Fault Act speaks only cryptically of "profits." [2] In defining "income," however, section 65B.46, subd. 6, includes within the term, in addition to salary, wages, tips, commissions, and professional fees, "other earnings from work." We think the business earnings of a self-employed person, when not paid out to that person in salary, may constitute "other earnings from work." This would seem to be the kind of economic detriment caused by disability that the No-Fault Act intends to cover. We hold, therefore, that to the extent it can be shown that gross income produced by a self-owned business has decreased during the period of the self-employed owner's disability, and the decrease is attributable directly and solely to the owner's disability, that de-

---

**2.** In defining the phrase "inability to work" for purposes of income loss benefits, Minn.Stat. § 65B.44, subd. 3 (1982), says this means inability to engage in any substantial gainful employment on a regular basis "for wage or profit." Nowhere, however, is the term "profit," susceptible to so many meanings, defined.

The Uniform Motor Vehicle Accident Reparations Act § 1(a)(5)(ii) defines "work loss" as "loss of income from work the injured person would have performed if he had not been injured." 14 U.L.A. 50 (1980). The Commissioner's notes state: "Work loss includes not only lost wages, but lost profit which is attributable to personal effort in self-employment (as distinguished from profit attributable to investment) or the cost of hiring a substitute to perform self-employment services." Commissioner's Comment, subsection (a)(4), 14 U.L.A. 54 (1980). Neither does the Uniform Act define "lost profits" further, perhaps because of the difficulty of doing so.

crease, in the absence of any salary or wage paid, represents "other earnings from work." For this kind of economic detriment, income loss benefits are payable.

We now return to the facts of this case. Mr. and Mrs. Rindahl own a 480-acre farm with about 150 acres open for grain and pasture, and conduct a beef and small grain operation. Mr. Rindahl devotes full time to the farm. Before her injury, Mrs. Rindahl worked full time in town, had primary responsibility for the household, and helped out on the farm with some chores and, in season, with some field work. Since Mrs. Rindahl is a co-owner of the farm, she qualifies as a self-employed person, but her contribution to the farm operation was more like Mr. Rindahl's contribution to the household operation. After Mrs. Rindahl was injured, no farm help was hired and others took over her relatively minor farm duties. At the time of the auto accident, the Rindahls also had commenced a hog operation with a new barn and 90 hogs, but they had not yet sold any hogs. In August of 1980, Mr. Rindahl was hospitalized for back surgery, and the couple were forced to sell the pigs because while Mr. Rindahl was disabled, his wife, with her own injury, was unable to care for the pigs alone. Claimant made an offer of proof that the hog operation, if it had continued, would have produced a profit of $17,000 a year.

■ On these facts, as a matter of law, claimant has not shown that the gross income of the farm operation has decreased during her disability because of her own disability. No evidence was offered as to the gross earnings of the farm operation as a whole, much less how Mary Lou Rindahl's inability to perform a relatively small portion of the farmwork could have adversely affected these earnings. Claimant's only evidence bearing on this issue was her offer of proof that the hog operation, if it had been continued, would have produced a profit of $17,000 a year. As the trial court ruled, in rejecting this offer of proof, the loss was at best speculative and, further, any loss from the hog operation was attributable to Mr. Rindahl's inability to work, not his wife's. Consequently, claimant is not entitled to income loss benefits for her services to the farm operation.

Affirmed in part and reversed in part.

WAHL, Justice (concurring in part, dissenting in part).

I agree that under Minn.Stat. § 65B.44, subd. 5 (1982), Rindahl is entitled to the reasonable value of the household services she was unable to perform because of her injury. I must respectfully dissent, however, from that portion of the majority decision holding that she is not entitled to disability and income loss benefits under Minn.Stat. § 65B.44 (1982) for her inability to do her farmwork. I would affirm the decisions of the trial court and the court of appeals holding that she is entitled to recover such benefits based on the reasonable value of the services she would have performed on the farm had she not been disabled.

I agree with the majority that the statute is unclear with respect to the compensation of self-employed persons for No Fault benefits for income loss. The express language of the statutory definition of "income," though, suggests that the legislature recognizes two measures of the value of income loss: the value of the work itself, measured by "salary, wages * * * and other earnings," and the value of things produced by work. The latter measure, as the majority recognizes, cannot be construed as the exclusive measure of a self-employed person's income; a self-employed person may also recover for the value of his or her work. When, as here, a self-employed person does not pay herself a salary or wages, the question becomes how the term "other earnings" is to be interpreted to measure income loss.

At common law the "reasonable value" of services provided is often used as a substitute method of valuation of work when other means fail or must be supplied in the interest of justice. Given that the

statute is intended not to penalize self-employed persons who do not pay themselves salaries or wages, similarly construing "other earnings" as the reasonable value of the services is consistent with the legislative scheme. Further, measuring "other earnings" by the reasonable value of services comports with the legislative intent to permit benefits to be calculated on some "direct, certain basis." The reasonable value of most services is subject to relatively simple and objective proof. In contrast, proof of loss of gross income and proof that the injury was a cause of such loss is extremely difficult to show. This is especially true when the claimant is a small farmer whose business is directly affected by numerous unpredictable variables ranging from the seasonal rainfall to political responses to international agricultural production. A self-employed small farmer, operating under those conditions, may well find proving that a drop in gross income was attributable to a short term injury an impossible hurdle. This penalty, imposed on self-employed persons who do not have the option of either paying themselves wages or hiring substitute help by requiring proof of gross income loss, is obscured by the majority's approach. In small farming operations in particular, cash on hand is a scarce resource. Yet, under the majority's rule, had Rindahl been able to hire substitute help, she would have been able to recover the cost of doing so and, further, to avoid the burden of proving a decline in business income. I do not agree that this disparity of treatment comports with the intent of the statute. I would affirm the court of appeals.

YETKA, Justice (concurring in part, dissenting in part).

I join in the dissent of Justice Wahl.